UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 3:09-00130 |
| ) | JUDGE CAMPBELL |
| ANTONIO ERVIN ) | |
| TASHEA BAUGH ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court are Defendant Ervin's Motion To Suppress (Docket No. 69) and Defendant Baugh's Motion To Adopt Co-Defendant's Motion To Suppress (Docket No. 74), as well as the Government's Response (Docket No. 80) to the Motions. The Court held an evidentiary hearing on the Motions on December 9, 2009. After the hearing, the parties filed supplemental briefs addressing the facts and issues raised at the hearing (Docket Nos. 100, 101, 102). For the reasons set forth below, the Defendants' Motions To Suppress are GRANTED.

II. Factual and Procedural Background

The Defendants challenge the search of Defendant Baugh's residence, 1004 Ainsworth Circle in Antioch, Tennessee on May 12, 2009. The Government contends that the search of the residence was executed pursuant to a valid search warrant.

The affidavit supporting the search warrant in this case was executed by Officer Greg Flanagan and states that the subjects of the investigation are Defendant Ervin, Defendant Baugh, and Ivan Moore. (Docket No. 69-1, at 4). The affidavit states that Defendant Ervin is alleged to have had a prior arrest for possession with intent to distribute cocaine, and Mr. Moore is alleged to have had a prior arrest for the sale of cocaine. (Id.). The affidavit alleges that the Metro Police

("NCSU") had targeted Defendant Ervin for investigation in March, 2008, and had executed a search warrant at a residence on Roger Williams Avenue at that time and recovered controlled substances. (Id.) The affidavit further alleges that Metro Police had been told by a "cooperating source" in March, 2008 that Defendant Ervin was a "major supplier of cocaine." (Id.) As for Defendant Baugh, the affidavit alleges that Nashville Electric Service records indicated active power in her name at the Roger Williams Avenue address on March 18, 2008, and at 1004 Ainsworth Circle, Antioch, Tennessee at the time of the affidavit. (Id.)

On May 12, 2009, the affidavit states, Officer Flanagan received information from a "Cooperating Source (CS)" that Defendant Ervin "a/k/a 'Gotti'" was living at 1004 Ainsworth Circle, Antioch, Tennessee. (Id.) The affidavit alleges that the CS also told Officer Flanagan that Defendant Ervin stored and sold cocaine at that address, and that the CS had provided directions and pointed out the residence to "Detective Simonik." (Id.) According to the affidavit, the CS stated that he had purchased large quantities of cocaine from Defendant Ervin at 1004 Ainsworth Circle "the last time being in December 2008." (Id., at 4-5).

The affidavit states that Mr. Moore "is a relative of the CS" and that he stays at 1004 Ainsworth Circle. (Id., at 5). The CS identified pictures of Defendants Ervin and Baugh. (Id.)

The remainder of the affidavit relates information obtained by law enforcement personnel after arriving at 1004 Ainsworth Circle on May 12, 2009 to perform a "knock and talk." The affidavit states that Mr. Moore answered the door and "denied consent" to search. (Id.) The affidavit states that the agents "[a]t this time" asked Mr. Moore and Defendant Baugh "to come outside while other agents prepared a search warrant." (Id.) The affidavit does not relate the request to Defendant Baugh to consent to a search and her subsequent refusal.

2

The affidavit then describes Drug Enforcement Administration ("DEA") Special Agent Ron Riddle's trip into the residence while the agents waited for the search warrant. The affidavit states that Agent Riddle asked Mr. Moore for his identification. (Id.) Mr. Moore stated that he did not have an identification, but that he had medication located in the computer room of "his" residence that had his name on it. (Id.) The affidavit states that Agent Riddle "requested permission" to obtain the medication and Mr. Moore "granted permission." (Id.) Agent Riddle then escorted Mr. Moore into the computer room of the residence, according to the affidavit, where there were four pill bottles with Mr. Moore's information. (Id.) The affidavit states that Mr. Moore told Agent Riddle that he had a heart condition and needed to take his heart medication, and asked to obtain a glass of water from the kitchen located next to the computer room. (Id.) Agent Riddle "agreed." (Id.) Once in the kitchen area, the affidavit states, Agent Riddle "observed 2 boxes of plastic baggies on the kitchen counter" and "also observed in plain view in a kitchen drawer that was partly opened, a set of digital scales with white residue." (Id.) Agent Riddle advised Officer Flanagan that he believed the white residue to be cocaine. (Id.)

The affidavit then states that a "K-9 officer" was called to check the white SUV that was parked in front of the residence. (Id.) The affidavit indicates that the SUV had a Tennessee Dealer Tag that was registered to U.S. Auto of Nashville, Tennessee. (Id.) The affidavit indicates that the "trained narcotics K-9, Mario" indicated the presence of narcotics from this white SUV. (Id.) The affidavit states that the CS had told Detective Siminok the SUV belonged to Defendant Ervin's "cocaine source of supply." (Id.)

At the hearing, the Government called three witnesses: Adrian Breedlove, Ron Riddle, and Charles L. Gravat. (Transcript of Hearing, at 2 (Docket No. 99) (hereinafter "Tr. at ___")). Defendant Ervin called Tina Yarbro as a witness, and Defendant Baugh did not call any witnesses. (Id.)

3

Detective Breedlove testified that he is employed by the Brentwood Police Department, and had been assigned to work with the DEA as a Judicial Task Force Officer on May 12, 2009. (Id., at 7). According to Detective Breedlove, he was directed to go to 1004 Ainsworth Circle in Antioch, Tennessee on that date for a "knock and talk." (Id.). He was accompanied by DEA Special Agent Ron Riddle, DEA Group Supervisor Charlie Gravat, Task Force Officer Jimmy Whitsett, and Task Force Officer Eddie McKenna. (Id., at 8).

Detective Breedlove estimated that the residence was located on a half-acre lot, and testified that the back yard of the residence was enclosed by a privacy fence. (Id., at 67, 69). Upon arrival, Detective Breedlove testified, certain officers went to the side of the house to check the backyard, while he and others approached the front entry. (Id., at 67, 70). Detective Breedlove testified that there were several dogs in the back yard. (Id., at 74).

Detective Breedlove testified that they arrived at the residence at approximately 11:50 a.m., and that one of the group knocked on the front door. (Id., at 8, 62). Ivan Moore answered the door, and the officers asked him for consent to search the house. (Id., at 8). Mr. Moore told the officers that he could not grant consent because he did not live at the house. (Id., at 8, 38). At about that time, Detective Breedlove testified, he saw Defendant Baugh, who was visibly pregnant at the time of the incident, descending the stairs and come to the front door. (Id., at 8, 82). The officers also asked Defendant Baugh for consent to search the residence. (Id., at 8). When she refused to give consent, Detective Breedlove testified, they kept Mr. Moore and Defendant Baugh outside the house while Officer Flanagan prepared and applied for a search warrant at another location. (Id., at 8, 10, 38, 56). Detective Breedlove did not know specifically who provided Officer Flanagan with the information for the search warrant affidavit. According to Detective Breedlove, the search warrant was executed around 4:30 or 5:00 p.m. (Id., at 38-39).

4

Soon after Defendant Baugh refused consent, according to Detective Breedlove, officers performed a "protective sweep" of the house for weapons and contraband. (Id., at 9, 87-89). During the sweep, they found no one else in the house and observed no contraband. (Id., at 9, 87-89). Detective Breedlove testified that some time thereafter, the officers asked Defendant Baugh and Mr. Moore for their identification. (Id., at 10, 40-41). Detective Breedlove and Officer Whitsett escorted Defendant Baugh into her bedroom where she retrieved her purse and Detective Breedlove checked it for weapons. (Id., at 10). According to Detective Breedlove, he saw a bundle of folded money in her purse, along with a sock that looked like it held money. (Id., at 10). Detective Breedlove testified that he left the money on the coffee table in the house. (Id., at 41). Defendant Baugh provided the officers with her identification. (Id., at 10, 80-81). Detective Breedlove testified that Defendant Baugh entered the house several times after that, escorted by officers, in order to use the bathroom, and that Mr. Moore was escorted into the house to retrieve his heart medication. (Id., at 11, 42).[1]

According to Detective Breedlove, Defendant Baugh and Mr. Moore were told that they were free to leave. (Id., at 9-10). Detective Breedlove testified that, at some point, while they were waiting for the search warrant, Mr. Moore spoke with the confidential informant on the telephone. (Id., at 76-79). Mr. Moore was not arrested. (Id., at 79). Also, at some point while waiting for the search warrant, Defendant Baugh's brother and other individuals arrived, were patted down, and told they had to leave, which was, according to Detective Breedlove, for officers' safety. (Id., at 81, 90-91).

---

[1] Detective Breedlove testified that although Mr. Moore told the officers he had lost his wallet and identification, Mr. Moore's wallet was found during the subsequent search. (Id., at 10, 15, 42).

5

Detective Breedlove recounted the items seized from the residence after the search warrant was eventually obtained and executed. (Id., at 15-23).

Detective Breedlove testified that during the subsequent search of the house, officers found Defendant Ervin's expired drivers' license, and observed male clothing in the house. (Id., at 24-25). Detective Breedlove testified that he believes Defendant Ervin lived at the residence. (Id., at 25).

Detective Breedlove denied that he saw a crack pipe and digital scale during the protective sweep as stated in a Report of Investigation dated May 15, 2009 and prepared by DEA Special Agent Tanya D. Bilyeu. (Id., at 27-30). According to Detective Breedlove, when Agent Riddle escorted Mr. Moore into the house to get his medication, he observed the crack pipe and the scales. (Id., at 30, 91). Detective Breedlove could not recall whether he accompanied Agent Riddle during that time. (Id., at 30, 42-43). At another point, however, Detective Breedlove testified that he escorted Defendant Baugh into the kitchen when she agreed to prepare food for Mr. Moore, and that he saw the digital scale in a drawer that had been left open. (Id., at 31-32, 43). Detective Breedlove could not recall observing a crack pipe. (Id., at 27, 43). Mr. Moore claimed that the crack pipe belonged to him. (Id., at 85).

Detective Breedlove testified that when he arrived at the residence, he had not talked with the confidential informant, had not been advised that the last sale from the home had been six months earlier, and had not talked to Detective Flanagan, who was in charge of the case. (Id., at 34, 63, 73). Detective Breedlove testified that there was not a detailed briefing prior to their arrival at the residence, and that it was a "fluid event." (Id., at 49, 51).

Detective Breedlove testified that he thought he had legal authority to enter after the search warrant was obtained, but stated that he did not read the search warrant affidavit or the search warrant. (Id., at 52-53, 94, 96).

DEA Special Agent Ron Riddle testified that he arrived at 1004 Ainsworth Circle on May 12, 2009 at approximately 11:50 a.m. (Id., at 97). Agent Riddle testified that he was accompanied by DEA Group Supervisor Gravat, Detective Breedlove, Officer Whitsett and Officer McKenna. (Id., at 97-98). According to Agent Riddle, Agent Gravat knocked on the door to the residence, and Mr. Moore came to the door, but could not give consent. (Id., at 98). Agent Riddle testified that Defendant Baugh then came down the stairs, and the officers asked her to step outside. (Id., at 98). The officers asked Defendant Baugh if anyone else was in the house because they believed Defendant Ervin might be there since they were told that the automobile belonging to his cocaine supplier was parked in the front of the house. (Id., at 99). Agent Riddle testified that Defendant Baugh refused to give consent. (Id., at 99).

Agent Riddle testified that while they waited for Officer Flanagan to prepare an application for a search warrant, the officers did a protective sweep of the house, but saw no other individuals and observed no contraband. (Id., at 99-100). During the time they were waiting for the search warrant, Agent Riddle testified, both Mr. Moore and Defendant Baugh were told they were free to leave several times. (Id., at 100). Agent Riddle testified that at some point during the wait, Mr. Moore told them that he needed to retrieve his heart medication from the house. (Id., at 101). Agent Riddle asked to accompany him so that he could use the medication to confirm Mr. Moore's identity. (Id.). While in the house, according to Agent Riddle, he observed a crack pipe laying next to Mr. Moore's pill bottles in the room Agent Riddle designated as "the office." (Id., at 101-02). Mr. Moore told Agent Riddle that he used the crack pipe to smoke crack cocaine. (Id., at 102). When they entered the kitchen for Mr. Moore to get a glass of water, Agent Riddle testified, he saw a scale inside a partially-opened drawer. (Id., at 102-04).

7

Agent Riddle testified that he also escorted Defendant Baugh to the bathroom inside the house two times during the wait. (Id., at 104). Also during the wait, according to Agent Riddle, the officers called for a canine unit to check out the vehicle parked on the public street in front of the house. (Id., at 105,113). Agent Riddle testified that the dog alerted on the vehicle but that in a subsequent consent search, no drugs were found. (Id., at 105-06).[2]

Also, at some point during the wait, Agent Riddle testified, Mr. Moore spoke on the phone in a call that originated with law enforcement personnel. (Id., at 128). Agent Riddle did not know the identity of the caller. (Id.)

Agent Riddle testified that he did not personally deal with the confidential informant and did not know whether he was credible or reliable. (Id., at 109-110, 122-23). Agent Riddle testified that they executed the search warrant at approximately 5:00 p.m. (Id., at 120). According to Agent Riddle, he had the authority to search the residence once the search warrant was signed. (Id., at 133).

DEA Supervisor Charles Gravat testified that he was the supervisor on the scene at 1004 Ainsworth Circle on May 12, 2009. (Id., at 138, 143). Agent Gravat testified that he arrived at the scene around noon, and was accompanied by Agent Riddle, Detective Breedlove, Officer Whitsit, and Officer McKenna. (Id., at 139). According to Agent Gravat, prior to arriving at the scene, he had been told that a person named "Gotti" lived there and stored his cocaine there, and that the vehicle parked in front of the residence was Gotti's source of supply. (Id., at 139). Agent Gravat testified that he decided to do a "knock and talk" to try and get consent to search the residence. (Id., at 139). According to Agent Gravat, "Gotti" was later identified as Defendant Ervin. (Id.)

---

[2] The vehicle had a dealer plate and was registered to a car lot. (Id., at 115).

When they arrived at the residence, Agent Gravat testified, Officers Whitsett and McKenna went to each side of the house and looked over the fence to try and secure the back, while he, Agent Riddle and Detective Breedlove went to the front door. (Id., at 140, 161-63).

Agent Gravat testified that when Mr. Moore answered the door, they told him that they had received information that cocaine was being stored there and they would like to have permission to search. (Id., at 140). Mr. Moore told them that he could not give permission because he was just staying at the house, but did not permanently live there. (Id., at 140-41). At that point, Agent Gravat testified, Defendant Baugh descended the stairs, came to the door and spoke with the officers, but refused to give consent to search. (Id., at 141). Agent Gravat testified that he told Defendant Baugh and Mr. Moore that the officers would apply for a search warrant, and that they would have no access to the residence until they obtained it. (Id., at 141).

Agent Riddle and Detective Breedlove then entered the house to do a "protective sweep." (Id., at 142). Agent Gravat denied that any contraband was seen during the sweep. (Id.).

According to Agent Gravat, he told Defendant Baugh and Mr. Moore they were free to leave several times during the wait for the search warrant. (Id., at 141). Agent Gravat testified that Agent Riddle asked Defendant Baugh and Mr. Moore for identification, and that Mr. Moore suggested that his name was on his medication. (Id., at 143). Agent Riddle accompanied Mr. Moore into the house to retrieve the medication, and later told Agent Gravat that he had seen digital scales with cocaine residue in an open drawer in the kitchen. (Id., at 143-44). Agent Gravat testified that Agent Riddle did not mention observing a crack pipe during this trip inside the house. (Id., at 144).

Agent Gravat testified that he permitted Defendant Baugh to go to the bathroom inside the house several times while accompanied by an officer. (Id., at 144). According to Agent Gravat, he kept Defendant Baugh's identification for a short period of time before returning it to

9

her, and seized her cell phone for officer safety. (Id., at 157). Agent Gravat testified that Defendant Baugh's aunts and brothers came by during the wait but were not detained. (Id., at 145).

Also during the wait, Agent Gravat testified, the officers arranged for a canine search of the white SUV parked on a public street in front of the residence. (Id., at 146, 160). Although the dog alerted on the vehicle, no drugs were found there. (Id.). According to Agent Gravat, the confidential informant had said that the vehicle belonged to Defendant Ervin's source of supply. (Id.). Agent Gravat testified that once the search warrant was issued, he believed he had authority to search the residence. (Id.).

According to Agent Gravat, Officers Flanagan and Simonik drafted the search warrant affidavit. (Id., at 166, 167-71). Agent Gravat testified that while he had interviewed the confidential informant that day, he was not responsible for handling the informant. (Id., at 148, 171). Agent Gravat testified that he could not recall that the information about drug activity in the house was six months old. (Id., at 148-49). According to Agent Gravat, the informant was in custody and had agreed to cooperate. (Id., at 158-59). Agent Gravat stated that he had not used the informant before and had no information regarding his past reliability. (Id., at 149). Agent Gravat testified that the confidential informant told him that Mr. Moore, his uncle, would be at the residence that day. (Id., at 156).

Defendant Baugh called Tina Yarbro, the mother of Defendant Ervin, to testify. (Id., at 175-76). Ms. Yarbro testified that she went by 1004 Ainsworth Circle at approximately 2:30 or 2:45 on May 12, 2009, and spoke with Defendant Baugh. (Id., at 176-77, 179). During her visit, she testified that she observed one officer going in and out of the house, and one officer walking around the back of the house. (Id., at 178-79). According to Ms. Yarbro, Defendant Ervin was living at 1004 Ainsworth Circle on May 12, 2009. (Id., at 176, 180).

10

### III. Analysis

#### A. Standing/Reasonable Expectation of Privacy

At the hearing, the Government argued that Defendant Ervin did not have a reasonable expectation of privacy in 1004 Ainsworth Circle, and therefore, could not raise a Fourth Amendment challenge to the search of May 12, 2009. The Government appears to have abandoned this issue as it is not addressed in the Government's post-hearing brief.

In any event, the Court concludes that Defendant Ervin has established a reasonable expectation of privacy in the residence searched. To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable. United States v. Washington, 573 F.3d 279, 282-83 (6th Cir. 2009). An expectation is objectively reasonable only when it is one that "society is prepared to recognize as legitimate." Id.

At the hearing in this case, the evidence indicated that Defendant Ervin lived at the residence at the time of the search. Detective Breedlove testified that officers found Defendant Ervin's expired drivers' license at the residence, and that he observed male clothing there. (Id., at 24-25). Ms. Yarbro testified that Defendant Ervin, her son, was living at the residence on May 12, 2009. (Id., at 176, 180). The Government adduced no evidence indicating that Defendant Ervin lived at another location. Accordingly, the Court concludes that Defendant Ervin had a subjective expectation of privacy in the residence, and that his expectation was objectively reasonable.

#### B. Probable Cause

The Fourth Amendment to the United States Constitution provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to the searched, and the persons or things to be seized." US. Const. amend. IV. Probable

11

cause for a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Frechette, 583 F.3d 374, 379 (6th Cir. 2009)(quoting Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The sufficiency of a search warrant and supporting affidavit is to be analyzed using a totality-of-the-circumstances approach. See, e.g., United States v. Higgins, 557 F.3d 381, 389 (6th Cir. 2009). The court's review of the sufficiency, however, is limited to the information set forth in the "four-corners" of the affidavit. United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005).

When a search warrant affidavit contains hearsay information from a confidential informant, the court "must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances. . ." Frazier, 423 F.3d at 532 (quoting United States v. Helton, 314 F.3d 812, 819 (6th Cir. 2003)). Absent any indicia of the informant's reliability, "courts insist that the affidavit contain substantial independent police corroboration." Frazier, 423 F.3d at 532.

In this case, the search warrant affidavit contains no facts supporting the reliability of the confidential informant. There is no statement that the source has provided reliable information in the past, or that the source has a long-standing relationship with Officer Flanagan or another officer.

The Government contends that the information provided by the confidential informant was independently corroborated by the officers. The source told the officers that Defendant Ervin stored and sold cocaine from 1004 Ainsworth Circle, and that he had purchased large quantities of cocaine from that residence six months prior to the date of the search warrant affidavit. The source also told the officers that his "relative," Mr. Moore, "stays" at the residence, and that Defendant Baugh was Defendant Ervin's girlfriend. Finally, the source

showed an officer the location of the residence and stated that an SUV parked in front of the residence was Defendant Ervin's "source of supply."

To corroborate this information, the officers determined that the electricity at the residence was in the name of Defendant Baugh; that Defendant Ervin and Mr. Moore had a prior drug arrest; that over a year earlier, officers had searched the former home of Defendant Baugh and found controlled substances; and that a canine unit indicated the presence of narcotics odor from the SUV. The only other corroboration in the search warrant affidavit was based on the officers' plain view observations after the warrantless seizure of the residence. The Court will consider the legality of that seizure below. In the absence of that plain view observation, however, the Court concludes that substantial independent police corroboration of the source's information is lacking. See United States v. Higgins, 557 F.3d at 389-90 (Police corroboration of benign details did not support informant's assertion of recent alleged criminal activity at the residence).

All the confidential informant had to know in this case to convince the officers of his cooperation was that Defendant Ervin and Mr. Moore, the informant's relative, had a criminal history involving narcotics; and that they, along with Defendant Baugh, lived at 1004 Ainsworth Circle on May 12, 2009. The rest of the information the informant provided to the officers – the purchase of drugs in the residence six months earlier; the vehicle parked in front of the residence belonged to Defendant Ervin's "source of supply" – could have been a complete fabrication as far as any corroboration is concerned. See Higgins, 557 F.3d at 390 ("The informant gave his statements after the police discovered a large amount of drugs in his car, giving him an incentive to cooperate with the police to help himself.")

The Government points to the positive alert by the canine to the vehicle parked in front of the residence as sufficient corroboration. The Government provided no evidence, however,

13

establishing that the vehicle was registered or otherwise possessed by Defendants Baugh or Ervin, or Mr. Moore. Furthermore, the Government has not cited any authority suggesting that narcotics stored in a vehicle parked on a public street in front of a residence provides probable cause that narcotics are stored in the residence. Finally, the Court notes that the subsequent search of the vehicle yielded no narcotics, and that the Government has not offered any proof, even obtained after the date of the search, corroborating the informant's allegation that the vehicle belonged to Defendant Ervin's "source of supply."

Thus, the Court concludes that the Government has failed to establish the reliability of the informant by citing a history of reliability, or through corroboration of information provided by the informant.

Even assuming the officers had corroborated the informant's allegations, the informant's statements about prior narcotics activity inside the residence did not provide probable cause to believe that narcotics would be stored in the residence on the date the warrant was obtained. The informant told the officers that his last narcotics transaction in the residence took place six months prior to the date of the affidavit. Thus, to the extent probable cause had ever existed to suggest that narcotics would be found at the residence, the information supporting such a conclusion had grown stale.

The probable cause inquiry "gauges the likelihood that evidence of a crime may *presently* be found at a certain location." United States v. Hython, 443 F.3d 480, 485 (6th Cir. 2006). The question of whether probable cause has grown stale is determined by "the circumstances of each case. . . and depends on the inherent nature of the crime." Id. The Sixth Circuit has held that courts should consider the following factors in making a staleness determination: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to

14

its holder?) and the place to be searched (mere criminal forum of convenience or secure operational base?)." Hython, 443 F.3d at 485 (quoting United States v. Spikes, 158 F.3d 913, 923 (6th Cir.1998)). According to the court, the passage of time becomes less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime. Id.

The Hython court explained that the sale of drugs out of a residence is not inherently ongoing. "Rather, it exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den." Id. As in Hython, the facts set forth in the search warrant affidavit do not establish that 1004 Ainsworth Circle was a "secure operational base for an ongoing drug enterprise." Id. Information that a drug transaction took place at the residence six months earlier in the absence of an indication that there is an ongoing and continuing operation is stale given that narcotics are "mobile, easily concealed, readily consumable, and highly incriminating." United States v. Kennedy, 427 F.3d 1136, 1142 (6th Cir. 2005).

The Government contends that the plain view observation of the white residue on the digital scales on May 12, 2009 helps to cure the staleness problem. Because the scales were presumably seen during a trip into the residence before a search warrant was obtained, the Government must establish that the entry was made pursuant to a recognized exception to the warrant requirement. The Government relies on the "plain view" exception.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." United States v. Campbell, 549 F.3d 364, 373 (6th Cir. 2008). The Defendants argue that the officers were not lawfully

15

present in the residence when the observation was made because the officers violated the Fourth Amendment when they seized the residence and prevented the residents from entering without a police escort. The Government contends that the officers were lawfully present in the residence when the scales were observed.

Both the Government and the Defendants cite Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) to support their respective positions. In McArthur, the Supreme Court held that police officers with probable cause to believe that the defendant had hidden contraband in his home did not violate the Fourth Amendment by preventing him from entering his home for the two-hour period of time it took for them to obtain a search warrant. The Court made clear, however, that their determination that the seizure of the residence was reasonable was based on the following factors: (1) the police had probable cause to believe that the residence contained marijuana – provided by the defendant's wife when she came outside the residence and told the police she had just seen her husband slide marijuana under the couch; (2) the police had good reason to fear that, unless restrained, the defendant would destroy the drugs before they could return with a warrant; (3) the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy by preventing the defendant from entering the residence unaccompanied while waiting for the search warrant; and (4) the police imposed the restraint for only two hours. 121 S.Ct. at 950-51.

In this case, the Court concludes that the Government is unable to satisfy the first factor identified by the Supreme Court as the officers were without probable cause to believe the residence contained contraband at the time of the seizure. As discussed above, the only facts the officers collectively knew at the time they approached and seized the residence was that a cooperating source said he had conducted a narcotics transaction at the residence six months earlier; that a vehicle parked on the public street in front of the residence allegedly belonged to

Defendant Ervin's "source of supply;" and that the individuals living in the house had prior drug arrests and had stored narcotics at a different residence over a year earlier. At the time the residence was seized, the officers had not seen the digital scales, and the canine unit had not alerted on the vehicle parked in front of the residence. As discussed above, the information provided by the informant whose reliability was not established, was not sufficiently corroborated, and was otherwise stale. These facts are vastly different than those confronting the Court in McArthur where the information came from an occupant of the residence, who was not herself under arrest and seeking to cooperate, and the information indicated that the narcotics were seen on the same day.

Furthermore, the Court is not convinced the seizure was otherwise "reasonable" under McArthur. Rather than conduct a more thorough investigation into information gained from an individual who was in custody and whose reliability was not established, prior to approaching the residents of the house, the officers in this case chose to gamble that they would gain consent to search through a "knock and talk." When that gamble failed, rather than risk destruction of narcotics that "might" be hidden in the residence, they seized the residence for approximately five hours, and prevented a visibly-pregnant Defendant Baugh from entering her home unaccompanied by the officers. The Government has cited no authority suggesting that this conduct has been condoned as "reasonable."

As the Government has failed to establish that the seizure of the residence was lawful, any entry made by the officers into the residence during the seizure was unlawful. Therefore, any observations made of items in the residence during the seizure are not lawful under the plain view doctrine. Consequently, the observation of the digital scales does not cure the staleness of

the information contained in the search warrant affidavit. Thus, the Court concludes that the search warrant was not supported by probable cause.

C. Good Faith

The Government argues that even if the search warrant affidavit is lacking in probable cause, the evidence should not be excluded because the officers acted in good faith, relying on United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Applying Leon, the court determines whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. The Leon Court identified four situations in which the exception would not apply: (1) where the affidavit supporting the search warrant contains knowing or reckless falsity; (2) where the issuing magistrate failed to act in a neutral and detached manner; (3) where the support affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (4) where the warrant is so facially deficient, through, for example, lack of particularity regarding the place to be searched or the things to be seized, as to negate the possibility of objectively reasonable reliance. Leon, 104 S.Ct. at 3421.

The Sixth Circuit has issued inconsistent opinions on the issue of whether the Leon good faith exception is even applicable where, as here, a warrant was secured in part on the basis of an illegal seizure. Cf. United States v. Davis, 430 F.3d 345, 358 n.4 (6th Cir. 2005)("Moreover, we agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure.") with United States v. McClain, 444 F.3d 556, 564-66 (6th Cir. 2006)(Without mentioning Davis, court holds that Leon applied to search warrant tainted by evidence obtained in violation of the Fourth Amendment).

Even if <u>Leon</u> may apply to a search warrant affidavit containing information obtained from an illegal seizure, the Court concludes that the exception is inapplicable to the facts adduced in this case because the facts regarding the illegal seizure were not truthfully and completely presented to the issuing magistrate. As discussed above, the only non-stale evidence indicating a "fair probability" that narcotics would be found in the residence on May 12, 2009 was the affidavit's statement that an officer saw "a set of digital scales with white residue." (Docket No. 69-1, at 5).[3] The affidavit states that this observation took place during a trip into the house after Agent Riddle "requested permission to obtain the medication, and Ivan Moore granted permission." (<u>Id.</u>) As the officers testified at the hearing, however, Mr. Moore clearly stated at the outset of the encounter that he did not have authority to grant consent for the officers to enter the house. The affidavit does not contain this important information. Instead, the affidavit states merely that Mr. Moore had "denied consent" to a search of the residence. (<u>Id</u>.) The affidavit does not state that he told the officers he lacked authority to do so, nor does it even mention the request to search made to Defendant Baugh, and her subsequent refusal.

Based on the information contained in the search warrant affidavit, the magistrate could have concluded that Mr. Moore had authority to grant consent to search the residence and initially denied consent for a full-scale search, but later granted permission for officers to accompany him to obtain his heart medication. The magistrate could have further concluded that such an entry into the residence was lawful, and therefore, observation of the digital scales in plain view was lawful. In short, the magistrate's decision that probable cause supported the search warrant is based on a knowing or recklessly false statement of the facts. <u>Cf.</u> <u>McClain</u>, 444

---

[3] As discussed above, the Government has cited no authority suggesting that the fact that a narcotics dog alerts on a vehicle parked on the public street in front of a residence, and not registered to the residents, constitutes probable cause to believe narcotics are within the residence.

F.3d at 566 (". . . Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search.") Under these circumstances, the Court concludes that the good faith exception should not be applied.

IV. Conclusion

For the reasons set forth herein, the Motions To Suppress are GRANTED.

It is so ORDERED.

                                        */s/ Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE